**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:19-cv-00438-CMA-MEH

CELLECT, LLC,

      Plaintiff,

v.

SAMSUNG ELECTRONICS CO. LTD., and
SAMSUNG ELECTRONICS AMERICA, INC.,

      Defendants.

---

**DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF**

---

## **TABLE OF CONTENTS**

I.          INTRODUCTION ......................................................................... 1

II.        LEGAL STANDARD .................................................................... 2

III.       TECHNOLOGY BACKGROUND .................................................. 4

IV.      ARGUMENT ................................................................................ 9

     A.    The Orientation Limitations ........................................... 9

          1.    "Second Plane" Limitations ................................. 9

          2.    "Stacked Arrangement" ..................................... 13

          3.    "Longitudinally Aligned With" / "Offset" ........................................... 17

     B.    "Pre-video Signal" ....................................................... 20

     C.    "Desired Video Format" ............................................... 24

     D.    "Generally Square" ...................................................... 25

     E.    Transceiver / Amplifier Section .................................... 26

     F.    "Time Select Switch" ................................................... 29

     G.    Means-Plus-Function Terms ........................................ 30

          1.    "Circuitry Means For Converting" ..................... 31

          2.    "Timing and Control Means" .............................. 32

V.       CONCLUSION ........................................................................... 33

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Asyst Techs., Inc. v. Empak, Inc.*,
  268 F.3d 1364 (Fed. Cir. 2001) .......................................................................... 31, 33

*B. Braun Med., Inc. v. Abbott Labs.*,
  124 F. 3d 1419 (Fed. Cir. 1997) ......................................................................... 31, 32

*Big Stik Mfg., Inc. v. Pitbull Tools & Supplies LLC*,
  No. 8:17-CV-2486-T-36MAP, 2018 WL 6829726 (M.D. Fla. Dec. 28,
  2018), *reconsideration denied*, No. 8:17-CV-2486-T-36SPF, 2019 WL
  2343140 (M.D. Fla. June 3, 2019) .......................................................................... 27

*Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*,
  815 F.3d 1314 (Fed. Cir. 2016) .................................................................................. 3

*Every Penny Counts, Inc. v. Am. Express Co.*,
  563 F.3d 1378 (Fed. Cir. 2009) ................................................................................ 19

*Geodynamics, Inc. v. Dynaenergetics US, Inc.*,
  No. 2:15-CV-1546-RSP, 2016 WL 6217181 (E.D. Tex. Oct. 25, 2016) .................... 26

*Indacon, Inc. v. Facebook, Inc.*,
  824 F.3d 1352 (Fed. Cir. 2016) ......................................................................... 20, 24

*Interval Licensing LLC v. AOL, Inc.*,
  766 F.3d 1364 (Fed. Cir. 2014), *cert. denied*, 136 S. Ct. 59 (2015) ........................ 26

*Intervet Inc. v. Merial Ltd.*,
  617 F.3d 1282 (Fed. Cir. 2010) ................................................................................ 23

*Irdeto Access, Inc. v. Echostar Satellite Corp.*,
  383 F.3d 1295 (Fed. Cir. 2004) ........................................................................... 3, 20

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
  __ F.3d __, No. 2019-1557, 2020 WL 2549542 (Fed. Cir. May 20,
  2020) .......................................................................................................................... 3

*Medrad, Inc. v. MRI Devices Corp.*,
  401 F.3d 1313 (Fed. Cir. 2005) .................................................................................. 3

*Micro Chem., Inc. v. Great Plains Chem. Co.,*
194 F.3d 1250 (Fed. Cir. 1999) ........................................................................ 31, 32

*Nystrom v. TREX Co.,*
424 F.3d 1136 (Fed. Cir. 2005) .............................................................................. 30

*Pause Tech., LLC v. TiVo, Inc.,*
419 F.3d 1326 (Fed. Cir. 2005) .............................................................................. 25

*Phillips v. AWH Corp.,*
415 F.3d 1303 (Fed. Cir. 2005) (en banc) .................................................... 2, 3, 29

*In re Power Integrations, Inc.,*
884 F.3d 1370 (Fed. Cir. 2018) .............................................................................. 11

*Teva Pharm. USA, Inc. v. Sandoz, Inc.,*
574 U.S. 318 (2015) .................................................................................................. 2

*Texas Digital Sys., Inc. v. Telegenix, Inc.,*
308 F.3d 1193 (Fed. Cir. 2002) .............................................................................. 31

*TVIIM, LLC v. McAfee, Inc.,*
851 F.3d 1356 (Fed. Cir. 2017) .............................................................................. 10

*UltimatePointer, LLC v. Nintendo Co.,*
816 F.3d 816 (Fed. Cir. 2016) ................................................................................ 12

*Wasica Fin. GmbH v. Continental Auto. Sys., Inc.,*
853 F.3d 1272 (Fed. Cir. 2017) .............................................................................. 11

*Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.,*
239 F.3d 1225 (Fed. Cir. 2001) ........................................................................ 31, 33

*Williamson v. Citrix Online, LLC,*
792 F.3d 1339 (Fed. Cir. 2015) .............................................................................. 31

*Wis. Alumni Research Found. v. Apple Inc.,*
905 F.3d 1341 (Fed. Cir. 2018), *cert. denied,* 140 S. Ct. 44 (2019) .............. 3, 13, 23

**Statutes**

35 U.S.C. § 112(6) ....................................................................................................... 30

35 U.S.C. § 301(a)(2) ................................................................................................... 10

**Other Authorities**

American Heritage College Dictionary 1373 (3d ed. 1997) ........................................... 29

Merriam Webster's Collegiate Dictionary 1193 (10th ed. 1997) ................................... 29

## TABLE OF ABBREVIATIONS

| Abbreviation | Term |
|---|---|
| Exhibit or Ex. | Exhibit to Declaration of Jae Woo Park in Support of Defendants' Claim Construction Brief |
| '839 patent | U.S. Patent No. 6,043,839 (Exhibit A) |
| '052 patent | U.S. Patent No. 9,186,052 (Exhibit B) |
| '740 patent | U.S. Patent No. 6,982,740 (Exhibit C) |
| '626 patent | U.S. Patent No. 6,452,626 (Exhibit D) |
| '742 patent | U.S. Patent No. 6,982,742 (Exhibit E) |
| '621 patent | U.S. Patent No. 7,002,621 (Exhibit F) |
| '255 patent | U.S. Patent No. 6,275,255 (D.I. 1-2) |
| '565 patent | U.S. Patent No. 9,198,565 (D.I. 1-10) |
| '896 patent | U.S. Patent No. 9,667,896 (D.I. 1-11) |
| '036 patent | U.S. Patent No. 6,862,036 (D.I. 1-5) |
| '369 patent | U.S. Patent No. 6,424,369 (D.I. 1-3) |
| Patents | Collectively, '839, '255, '565, '052, '896, '740, '626, '036, '369, '742, and '621 patents |
| Asserted Claims | Claims asserted by Cellect in this litigation:<br>'839 patent: Claims 1, 4, 28, 30<br>'255 patent: Claims 1, 4, 7, 8, 11<br>'369 patent: Claims 1, 17, 19, 21, 22, 27, 49, 55, 61<br>'626 patent: Claims 1, 5, 11, 33, 34, 58, 64<br>'036 patent: Claims 1, 2, 6, 17, 33, 35<br>'740 patent: Claims 1, 2, 13<br>'742 patent: Claims 22, 42, 58, 66<br>'621 patent: Claims 25, 26, 27, 28, 29, 33<br>'052 patent: Claims 1, 2, 3, 7<br>'565 patent: Claims 1, 6, 31, 32, 36<br>'896 patent: Claims 1, 5, 21 |
| '901 patent | U.S. Patent No. 5,929,901 (Exhibit G) |
| Neikirk | Declaration of Dr. Dean P. Neikirk, Ph.D. in Support of Samsung's Claim Constructions |

## I.  INTRODUCTION

Pursuant to the Scheduling Order (D.I. 27) and D.C.COLO.LPtR 15, Samsung submits this Opening Claim Construction Brief addressing twelve disputed terms in the eleven asserted patents.

Cellect's Patents, the first of which was sought in 1997, apply known CMOS imaging technology to what the Patents call a "reduced area imaging device."  According to the Patents, technological advancements made CMOS image sensors desirable for endoscopes (medical cameras inserted into the human body).  Existing CMOS sensors, however, had a large cross-sectional area that needed to be reduced to keep an endoscope sufficiently small and narrow.  To do this, the Patents describe and claim two approaches:  the "control box" approach and the "stacked" approach.  The "control box" approach moves bulky circuitry to a control box separate from the image sensor.  The "stacked" approach stacks this circuitry behind the image sensor.  Both approaches enable endoscopes to use CMOS sensors while retaining their pen-like shape (for insertion into the body).

Separately, by the late 1990s, consumer electronics companies were integrating cameras into phones.  In the early 2000s, the named inventors of the Patents tried to capitalize on this trend and sought derivative patents, combining their pen-like endoscope camera with a phone.  But unlike wide, flat modern-day smartphones with built-in cameras, these patents disclosed using the same pen-like structure for an external camera (still using the "control box" or "stacked" configurations) that was connected, for example, to a phone through a retractable cable:



*Fig_2*

Now, seeking to stretch its pen-like-camera concept to accuse Samsung's products (wide, flat smartphones with internal cameras), Cellect proposes claim constructions that are divorced from the disclosures in the Patents and stretch the claims far beyond what they recite.  Compounding this error, Cellect seeks to replace simple terms the jury will understand (like "stacked" and "switch") with unclear, confusing language.  By contrast, Samsung gives the disputed claims terms their reasonable and straightforward meanings consistent with binding Federal Circuit law.  For the reasons explained below, Samsung's proposed constructions should be adopted.

## II.    LEGAL STANDARD

Claim construction is a question of law for the Court.  *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 333 (2015).  Claim terms are generally construed to have the ordinary and customary meaning to a person of skill in the art at the time of invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc).  When construing claim terms, courts primarily rely on intrinsic evidence consisting of the patent's claims, specification, and prosecution history.  *Id.* at 1315.

The process begins with the words of the claims, as they often "provide substantial guidance as to the meaning of particular claim terms." *Id.* at 1314.

Claim terms are not construed "in a vacuum." *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "A party is…'not entitled to a claim construction divorced from the context of the written description and prosecution history.'" *Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1320 (Fed. Cir. 2016) (quoting *Nystrom v. TREX Co.,* 424 F.3d 1136, 1144-45 (Fed. Cir. 2005)).

Where "a patent repeatedly and consistently characterizes a claim term in a particular way, it is proper to construe the claim term in accordance with that characterization." *Wis. Alumni Research Found. v. Apple Inc.*, 905 F.3d 1341, 1351 (Fed. Cir. 2018), *cert. denied,* 140 S. Ct. 44 (2019) (citation and internal quotations omitted); *Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1301-02 (Fed. Cir. 2004) (collecting cases). This is because "[t]he only meaning that matters in claim construction is the meaning in the context of the patent." *McRO, Inc. v. Bandai Namco Games Am. Inc.*, __ F.3d __, No. 2019-1557, 2020 WL 2549542, at *5 (Fed. Cir. May 20, 2020) (citation and internal quotations omitted).

Courts may also rely on extrinsic evidence, including expert opinions. *Phillips*, 415 F.3d at 1317. Extrinsic evidence is less significant and cannot be used to contradict or vary the meaning established by the intrinsic record. *Id.* at 1317-18.

## III.    TECHNOLOGY BACKGROUND

The Patents relate to "solid state image sensors which are configured to be of a minimum size."   1:9-12.[1]   By 1997, when the earliest patents were sought, imaging technology was advancing rapidly, and "complementary metal oxide semiconductors" (CMOS) imagers were already well-known.   1:36-2:33.

Compared to charge-coupled device (CCD) sensors, CMOS sensors produced low-noise images while using less power.   1:42-47, 59-62.   CMOS sensors could also output digital signals instead of analog signals, allowing them to function as a "true digital 'camera on a chip.'"   2:34-44.   But a drawback of CMOS sensors was their size—while a CMOS camera-on-a-chip had "great merit for applications in many industrial areas," the Patents assert there was still a need for a reduced area imaging device suitable for small/narrow devices, like endoscopes (shown below in Fig. 1a with its camera located at 16).   3:1-6.



---

[1] All cites are to the '839 patent (Ex. A), unless otherwise indicated.

The Patents attempt to address this alleged need by rearranging circuitry to give the image sensor a minimum profile area in two alternative ways.  3:8-26.  The first is to relocate circuitry to a video processing board in a separate box remote from the image sensor (*i.e.*, the remote "control box" option).  The other is to place this circuitry on a separate circuit board behind the image sensor (*i.e.*, the "stacked" option) so the circuitry and image sensor have roughly the same cross-sectional area.

Figure 1b (below) illustrates the "control box" approach.  The image signal transmitted from image sensor 40 through conductor 48 is called a "pre-video signal." 6:58-64.  The Patents explain that, because image sensor 40 does not include circuitry to produce a digital signal, "the pre-video signal is an analog signal."  12:10-13.  This analog pre-video signal is converted by video processing board 50 in control box 30 to create a "post-video signal."  6:62-7:5, 12:47-50, 13:10-13.



In the "stacked" approach, circuitry is "stacked" and thus "placed directly behind" image sensor 40, as shown below.[2]  7:26-27.



By stacking circuit boards 50 and 60 behind image sensor 40, the "stacked" structure's cross-sectional area is smaller than if the circuitry were placed with the image sensor. Cellect recently told the Patent Office that its "stacked" approach is the "invention" and "core concept" of the Asserted Claims:  "the core concept of the claimed invention" is "to 'take advantage of 'camera on a chip' technology, but rearrange the circuitry in a **stacked relationship** so that there is a minimum profile presented when used within a surgical instrument or other investigative device.'"  Ex. K, at 1[3].

---

[2] Figures 1b and 2a-b refer to the same image sensor (40) and video processing board (50).
[3] All emphases added unless indicated otherwise.

In both the "control box" and "stacked" alternatives, image sensor 40 outputs an analog signal.  This is because, to reduce cross-sectional area, any analog-to-digital conversion circuitry is relocated from image sensor 40 to video processing board 50. Figures 4a-4b show image sensor 40 outputting an "Analog" signal (PRE-VIDEO OUT) to video processing board 50 (PRE-VIDEO IN), which processes the pre-video signal to generate a "post-video signal" for display.  5:23-28.



Phone manufacturers in the late 1990s started including cameras in their devices (*see, e.g.*, '626 patent, 3:40-43). In the early 2000s, the named inventors filed new patent applications, adding additional disclosure relating to phones and PDAs to their base endoscope disclosure. This resulted in the family tree shown in Exhibit J.

The earliest-filed patent applications ('839, '255, and '740 patents) and some later-filed applications ('565, '052, and '896 patents) are expressly directed to endoscopes, while certain later applications are directed to PDAs ('369 and '742 patents) and telephones ('626, '036, and '621 patents). Importantly, the PDA/phone patents all disclose a removable, pen-like camera utilizing the "control box" or "stacked" alternatives. This stands in sharp contrast to the accused Samsung phones with integrated cameras:



**Claimed Invention**                **Accused Samsung Galaxy S5**

## IV.   ARGUMENT

The parties dispute the constructions of twelve terms.  D.I. 68-1.  For the Court's convenience, Exhibit H includes all Asserted Claims with disputed terms highlighted and Exhibit I provides the parties' competing and agreed to constructions.  There are slight variations in language between claims.  Where variations matter, each is addressed separately.   Where differences are immaterial, representative claim language is presented.

### A.   The Orientation Limitations

#### 1.   "Second Plane" Limitations

| Exemplary Term | Samsung | Cellect |
|---|---|---|
| "a first circuit board lying in a second plane"[4] | "a first circuit board placed in a stacked arrangement with the image sensor." | plain and ordinary meaning |

Nearly every Asserted Claim requires that a component lies in a first plane (*e.g.*, "an image sensor"), while another lies in a "second plane" (*e.g.*, "a first circuit board")— *i.e.*, the image sensor and first circuit board are in different "planes."  For example, '839 claim 1 recites "[a] reduced area imaging device comprising: an imager sensor lying in a first plane…a first circuit board lying in a second plane."

---

[4] The arguments relating to this exemplary term of claim 1 of the '839 patent apply to all variations of the "second plane" limitations, including claims requiring a circuit board in a "third plane"  *See* Exhibit I.  To narrow issues, Samsung is no longer asserting these limitations are indefinite.

The Patents require, consistent with Samsung's proposed construction, that the "second plane" component be stacked with the "first plane" component. Cellect proposes that plain and ordinary meaning applies.

> **(a)   Cellect Is Not Interpreting The "Second Plane" Limitations Based on Their Actual Plain And Ordinary Meaning**

Based on a straightforward reading of the claims and their requirement for "first" and "second" planes, it is clear that the "second plane" limitation necessitates that the image sensor (which is in the first plane) and first circuit board (which is in the second plane) be in ***different*** planes.[5]   Otherwise, these components would lie in the same plane, rendering the requirement for a "second" plane superfluous.   Samsung's construction reflects this common sense reading of what the claims require.   While Cellect proposes a construction of "plain and ordinary meaning," its opposition to Samsung's Motion to Dismiss reveals Cellect's true intention behind its non-construction—to conflate the "first" and "second" planes and broaden the claims to cover the non-stacked arrangement of components in a modern-day, flat smartphone:

---

[5] Samsung has filed 20 IPR petitions at the Patent Office, demonstrating Cellect's claims are invalid.  Consistent with the statutory purpose of 35 U.S.C. § 301(a)(2)—to preclude a "patent owner" from advancing conflicting positions in litigation and before the PTO—Samsung's petitions applied the prior art against Cellect's claims in those IPRs consistent with the broader implicit scope that Cellect advanced in its infringement allegations here. To be sure, Samsung does not agree with many of those interpretations and believes the claims are narrower, as noted herein, but, because Cellect is attempting to stretch its claims for infringement purposes in this case, it should be held to the consequences of those positions in the IPRs.  *See TVIIM, LLC v. McAfee, Inc.*, 851 F.3d 1356, 1362 (Fed. Cir. 2017) (citation omitted) ("Claim terms must be construed the same way for the purpose of determining invalidity and infringement.").

> [C]ertain claims of the Asserted Patents explain that a plane, either the first plane, or the second plane, can be defined by its length and width, such that two planes can be offset from one another, parallel or longitudinally aligned…. In other words, ***two separate circuit boards on a flat surface can define two different planes*** even if the circuit boards are not on-top of, or below, each other (e.g., they can be offset from one another).

D.I. 29, at 13.   Thus, Cellect's apparent understanding of "plane" would allow for two components, unstacked and sitting side-by-side on a flat surface (like the LEGO® bricks below), to somehow lie in two different planes:



Cellect's interpretation of "plane" is inconsistent with its common meaning, the claim requirement for a "first" and a "second" plane, and the teachings of the Patents. Indeed, the Patents teach that a reduced area imaging device is achieved by stacking components in ***different*** planes.  Cellect's "plain and ordinary meaning" interpretation is divorced from this teaching, and effectively renders superfluous the "second plane" requirement.  *In re Power Integrations, Inc.*, 884 F.3d 1370, 1375-77 (Fed. Cir. 2018) (reversing construction that "renders claim language meaningless" and "omit[s] any consideration" of the specification's emphasis on the need to minimize size of the invention); *Wasica Fin. GmbH v. Continental Auto. Sys., Inc.*, 853 F.3d 1272, 1288 n.10 (Fed. Cir. 2017) ("It is highly disfavored to construe terms in a way that renders them void, meaningless, or superfluous.")

**(b)     Samsung's Construction Is Consistent with Federal Circuit Precedent and the Intrinsic Record**

Beyond the claim language itself, the specifications of the Asserted Patents further demonstrate that the relevant claimed components are in a stacked relationship and lie in different planes.  The '742 patent, for example, directly associates using multiple planes with stacking the components.   "The video processing board 50 itself may be placed on **one or more planes** on corresponding circuit boards containing video processing circuitry.  FIG. 1a illustrates a single video processor board 50 located **directly behind** [*i.e.*, stacked with] image sensor 40…."  '742 patent, 15:56-60.



And even when the Patents do not use the term "planes," the Patents illustrate the circuitry as being "placed in a stacked fashion" with the image sensor.  Abs; *see also* 4:14-17 (contrasting "stacked" embodiment with "remote" embodiment).  The Patents also repeatedly confirm that stacking components (*i.e.*, putting them in different planes) reduces cross-sectional area, providing a "reduced area imaging device."  *See, e.g.,* 3:8-13, 7:26-27, 8:37-40; '742 patent 4:12-17, 5:60-63, 7:26-29, 16:1-4.  It is in the context of this repeated and consistent characterization of the stacked alternative that the claims must be construed.  *See Wis. Alumni,* 905 F.3d at 1351; *UltimatePointer, LLC v. Nintendo*

*Co.*, 816 F.3d 816, 823 (Fed. Cir. 2016). For this reason, Samsung's proposed construction is correct, and Cellect's "plain and ordinary meaning" construction invites mischief and, as demonstrated by Cellect's opposition to Samsung's motion to dismiss, is inconsistent with the intrinsic evidence.

**(c)    Cellect's Public Statements Confirm Samsung's "Stacked" Construction**

Cellect's Complaint further confirms that, in the context of the Patents, components on different planes are "stacked."  *See, e.g.*, D.I. 1, ¶ 15 ("The '839 Patent is generally directed towards a reduced area imaging device in which a CMOS image sensor and circuitry are placed in a ***stacked*** fashion at the same location.  This patent relates to the use of ***stacked*** CMOS technology without the use of an enabling technology.  The '839 Patent discloses and specifically claims inventive concepts that represent significant improvements over conventional single-chip imaging devices with the image sensor and image processing ***on the same plane***.").   For this additional reason, Samsung respectfully urges that its proposed construction is correct and Cellect's non-construction should be rejected.

**2.    "Stacked Arrangement"**

| Samsung | Cellect |
|---|---|
| plain and ordinary meaning | "placed directly or indirectly above or below" |

The parties dispute whether "stacked arrangement" requires construction.  Here, because the Patents use "stacked" in its traditional, ordinary way, it requires no construction.

The Patents' "stacked" language will be readily understood by the jury.  The jury, for example, will understand that two objects, like the red and green LEGO® bricks below, are in a "stacked arrangement" when one is behind the other (or above or below, depending on perspective):



This arrangement is consistent with image sensor 40 and boards 50 and 60 of Fig. 2b, which stacks them in different planes:



The jury will also understand that two partially overlapping bricks are also stacked. If the green brick slides two pegs to one side, so that it partially overhangs the red brick below it, those bricks remain in a stacked arrangement:



And if a third white brick is placed in between the red and green bricks, those red and green bricks would still be in a "stacked arrangement" (and the white brick would be "stacked" with both the red and green bricks). This is true regardless of whether the bricks were perfectly aligned, or if one brick overhangs the others:

 

These common-sense interpretations are consistent with the plain and ordinary meaning of the phrase "stacked arrangement" and how "stacked" is used in the Patents:

- "It is one object of this invention to provide reduced area imaging devices which take advantage of "camera on a chip" technology, but rearrange the circuitry in a **stacked relationship** so that there is a minimum profile

presented when used within a surgical instrument or other investigative device." 3:8-13.

- "In a second embodiment, the image sensor and the processing circuitry may all be placed in a ***stacked arrangement*** of circuit boards and positioned at the distal tip of the endoscopic instrument." 4:14-17.

- "Alternatively, as shown in FIG. 3b, the entire imaging device 11 may be incorporated within camera group 80, each of the elements of the imaging device being placed in the ***stacked arrangement*** similar to FIG. 2b." 8:37-40.

Consistent with this ordinary usage, the Patents describe a "stacked arrangement" as a component "placed directly behind" another component. 7:26-27 ("As shown in ***FIG. 2b***, the video processing board 50 may be ***placed directly behind*** image sensor 40"), 8:37-40 ("Alternatively, as shown in FIG. 3b . . . each of the elements of the imaging device [are] placed in the ***stacked arrangement*** similar to ***FIG. 2b***."). *See also* '742 patent, 7:26-29, 10:5-11, 10:17-21, 10:41-45, 15:56-63, 16:1-4.



In the parties' meet-and-confers, Cellect made clear that its proposed construction is broader than the ordinary meaning of stacked and would cover a situation where the white and green bricks are at different elevations, but completely offset from one another (*i.e.*, adjacent (below left), or inches or even feet apart (below right))—the product of including "indirectly" in its construction. Thus, under Cellect's construction, the

disconnected white and green LEGO® bricks in both images below are somehow "stacked":

 

The absurdity of Cellect's position is further illustrated by the following example, also discussed during the parties' meet-and-confers.  If one cardboard box is placed on top of another, both parties agree they are "stacked."   But Cellect contends that if someone picks up the upper box and moves it sideways so the lower box is no longer underneath it (such that the upper box, if dropped, would fall to the floor), those two boxes are still "stacked."  This is indisputably not the plain and ordinary meaning of "stacked," and is inconsistent with how "stacked" is used in the Patents.

### 3.      "Longitudinally Aligned With" / "Offset"

| Term | Samsung | Cellect |
|------|---------|---------|
| "longitudinally aligned with" | centered with | "being substantially parallel and directly or indirectly above or below" |
| "offset from" | not centered with | "not exactly aligned with" |

Samsung's constructions are simple and straightforward, and put into words what the Patents claim and describe.  In contrast, Cellect's constructions distort that record, are imprecise, and would be difficult for the jury to apply.

The claims use "longitudinally aligned with" and "offset" to describe the orientation of components relative to each other. *See, e.g.*, '839 Claims 1 and 8.  The Patents explain these concepts:

> Any imaging elements that are found on boards 50 or 60 must be able to be placed on one or more circuit boards which are ***longitudinally aligned*** with image sensor 40 along longitudinal axis XX.  If the profile area is not critical in terms of limiting the largest sized imaging element within the imaging device, then the additional circuit boards 50 and 60 which are normally placed in line with image sensor 40 can be aligned in an ***offset*** manner or may be larger than the profile area of image sensor 40.

7:39-48.  Fig. 2b shows longitudinal axis XX, which runs through the center of image sensor 40.  Circuit boards 50 and 60 are centered with that image sensor:



In other words, if the circuit boards are centered with the sensor, they are "longitudinally aligned."   If, however, they are not centered, they are "offset," as shown below in a modified version of Figure 2b:



18

Samsung's constructions are consistent with the Patents' description; Cellect's constructions are not.

Cellect's construction of "longitudinally aligned" allows components to be "indirectly above or below" each other.  According to Cellect, as explained above with respect to "stacked," this allows for components to not overlap at all.  Thus, Cellect's construction is so broad that it covers a situation in which the components are not at all aligned and are, in fact, entirely offset from each other as shown in a further modified Figure 2b:



Cellect's construction for "offset" fares no better and injects further ambiguity. What does "not exactly aligned" mean?  Does alignment refer to being parallel, or is lateral movement considered?  What if part of the component is parallel, but another portion is not?  Ultimately, these unanswered questions would be left for the jury.  *See Every Penny Counts, Inc. v. Am. Express Co.*, 563 F.3d 1378, 1383 (Fed. Cir. 2009) ("[T]he court's obligation is to ensure that questions of the scope of the patent claims are not left to the jury.") (citation omitted).

Because only Samsung's constructions conform to the intrinsic record, they should be adopted.

**B.    "Pre-video Signal"[6]**

| Samsung | Cellect |
|---------|---------|
| "an analog image signal transmitted by the image sensor" | "an image signal electrically transmitted from the image sensor" |

The parties agree that the pre-video signal is transmitted by the image sensor. 6:58-64.  The parties dispute, however, whether the pre-video signal is analog.  Because "pre-video signal" is a coined term that does not have an accepted meaning, the specification controls and Samsung's analog construction should be adopted.

Claim terms with no established meaning to a skilled artisan "ordinarily cannot be construed broader than the disclosure in the specification."  *Indacon, Inc. v. Facebook, Inc.*, 824 F.3d 1352, 1357 (Fed. Cir. 2016); *Irdeto,* 383 F.3d at 1300 ("[A]bsent such an accepted meaning [in the art], we construe a claim term only as broadly as provided for by the patent itself.").  As explained by Samsung's expert, Dr. Dean P. Neikirk, "pre-video signal" is one such term.  *See* Neikirk ¶¶ 50-61.[7]

The Asserted Claims all recite that a pre-video signal is output by the image sensor.  *See, e.g.*, '839 claims 1 and 28.  The specification expressly states that "the pre-video signal is an analog signal." 12:10-11; '742 patent, 11:2-5 ("the video processor

---

[6]  Samsung's argument focuses on "pre-video signal," but applies equally to "first signal."
[7]  Dr. Neikirk has a Ph.D. in applied physics from the California Institute of Technology and over 30 years of experience in electronic systems, including imaging devices for electronic cameras.  Dr. Neikirk is currently a Professor at The University of Texas.

50...receives the analog pre-video signal...").  The figures, too, show image sensor 40 outputting a pre-video signal that is "Analog":



*See* 9:60-62.

That the pre-video signal is analog is not surprising.  By 1997 (when Cellect sought its first patent), CMOS sensors could produce digital signals, allowing for a digital "camera on chip."  2:34-42, 3:1-2.   But this digital "camera-on-chip" was not appropriate for endoscopes because the CMOS sensor's cross-sectional area was too large.  3:2-7.  As explained in Section III, the Patents reduce the sensor's cross-sectional area by removing some circuitry—***including the analog-to-digital conversion circuitry that converts the analog image signal into a digital signal***—and placing it in control box 30 (Figure

21

1b) or stacking it behind the image sensor 40 (Figure 2b). Re-locating this circuitry reduces cross sectional area, but with a necessary trade-off—the image sensor output is analog, not digital.



The Patents confirm that analog-to-digital conversion takes place outside the sensor, *e.g.*, on video processing board 50. Figures 5a-5e show exemplary circuitry for video processing board 50. 12:46-49. Figure 5b shows that video processing board 50 includes analog-to-digital converter 142 to convert the sensor's analog pre-video signal to a digital signal. *See* 12:58-13:13; Neikirk ¶ 52-60.[8]

---

[8] There would be no need to include an analog-to-digital converter on video processing board 50 if the pre-video signal were digital. *See* Neikirk ¶ 52-60. And as Dr. Neikirk explains, outputting a digital video signal from the CMOS sensor would make no sense in the context of the Patents because this would necessarily require sensors with larger cross-sectional areas to produce that signal. *Id.*



*Fig. 5b*

Despite the Patents' clear teaching, Cellect's construction ignores that the "pre-video signal" is analog.  In purported support, Cellect cites to the "analog pre-video signal" limitation of claim 1 of its unasserted '901 patent.  Ex. G. That this single claim in an unasserted patent requires an analog pre-video signal does not mean "pre-video signal" (without the term analog) is somehow entitled to a broader construction.  A claim term, especially a term coined in a patent, is not entitled to an interpretation broader than what the specification supports.  *See Wis. Alumni*, 905 F.3d at 1351-52 (rejecting construction for a coined term as improperly expanding claim scope beyond the specification); *Intervet Inc. v. Merial Ltd.*, 617 F.3d 1282, 1287 (Fed. Cir. 2010) ("[T]erms coined by the inventor

23

are best understood by reference to the specification.").  Here, the specification supports only an analog "pre-video signal."

### C.    "Desired Video Format"

| Samsung | Cellect |
|---|---|
| "a format for a video signal that is ready for directly viewing on the claimed video [view screen/monitor]" | "a format that may be viewed on a standard or desired video device" |

Although the parties' constructions appear similar, there are, as explained below, important differences.

Certain claims require "converting said pre-video signal to a desired video format" for viewing on a screen/monitor.  *E.g.*, '742 claim 1.  Although the Patents' specifications do not use the phrase "desired video format," they do specify that the pre-video signal is converted to a "video ready signal" that can be "viewed directly" on a display:

> Video processing board 50 then carries out all the necessary conditioning of the pre-video signal and places it in a form, also referred to herein as a ***video ready signal*** so that it may be ***viewed directly*** on a remote video device such as a television or standard computer video monitor.

*Id.* 9:58-63; *see also id.* 11:7-9 ("the video signal is video ready, meaning that it may then be directly viewed on a remote compatible video device…").  The Patents further explain how the pre-video signal is processed to place it in a format that is "ready for viewing" on a display.  '742 patent, 14:14-25; 6:37-44, 11:5-16, 18:11-24; '621 patent, 6:22-24 ("The video ready signal...may be of differing video formats for viewing on different types of video devices").  Thus, "desired video format" is, as Samsung construes it, a format for a video signal that is ready for direct viewing on a display.  *Indacon,* 824 F.3d at 1357.

Cellect's construction requires "a format that may be viewed."  But a *format* is not viewed—a *signal* is.  This inaccuracy could confuse the jury.  And "desired video format" is used in multiple claims, each of which is explicitly limited to a specific device. *See, e.g.*, '742 claim 22 ("video view screen"); '621 claim 25 ("video monitor").  Cellect improperly expands claim scope by allowing a format for any "standard or desired video device."  See *Pause Tech., LLC v. TiVo, Inc.*, 419 F.3d 1326, 1331 (Fed. Cir. 2005) (rejecting broader construction and adopting interpretation appropriate in the context of the entire claim).

### D.    "Generally Square"

| Samsung | Cellect |
|---|---|
| "said image sensor has a square shape" or, in the alternative, this term is indefinite | "square for the most part" |

The parties agree that "generally square" at least means "square."  Indeed, the Patents expressly disclose a square image sensor.  '052 patent, Fig. 2b, 9:3-4.



*Fig. 2b*

The Patents' claims and specifications do not, however, provide guidance as to how a square-shaped image sensor might be modified so that it has a "generally" square shape.  *See Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370-74 (Fed. Cir. 2014), *cert. denied*, 136 S. Ct. 59 (2015) (finding a term of degree indefinite when "sufficient guidance is lacking in the written description"); *see also* Neikirk ¶¶ 62-73.  For example, can the sensor have more than four sides?  Can the corners be rounded?  Can the sides have different lengths, and if so, how different?  Because the Patents do not answer these questions, a skilled artisan can conclude only that "generally square" means square.  *See* Neikirk ¶¶ 62-73.  If it means anything else, it is indefinite.  *See Geodynamics, Inc. v. Dynaenergetics US, Inc.*, No. 2:15-CV-1546-RSP, 2016 WL 6217181, at *15 (E.D. Tex. Oct. 25, 2016) (finding "substantially equal to the total depth of penetration/(the tunnel)" indefinite because specification disclosed only depths that are "***equal***," not "substantially equal").

### E.    Transceiver/Amplifier Section

| Samsung | Cellect |
|---------|---------|
| "component including a transceiver and amplifier" | "circuitry including a transceiver function and an amplifying function" |

The parties disagree as to whether the transceiver/amplifier section is a component (Samsung) or circuitry (Cellect).  As explained below and already noted by the Court in connection with Samsung's motion to dismiss (D.I. 37 at 13-16), if the transceiver/amplifier section is a separate component, then a product needs three transceivers to infringe.  Because Samsung's accused products have only two

transceivers, Cellect proposes that the transceiver/amplifier section is just "circuitry" so it can argue that transceiver/amplifier section is part of the other two claimed transceivers.

Samsung is correct—the transceiver/amplifier section is a separate component. Claim 66 of the '742 patent, for example, requires three transceivers:

> a radio transceiver element **[first transceiver]**…for wirelessly transmitting said converted pre-video signal…

> a radio transceiver module **[second transceiver]**…for wirelessly communicating with said radio transceiver element and receiving said converted pre-video signal…

> a transceiver/amplifier section **[third transceiver]** electrically coupled to said transceiver radio module for amplifying and further transmitting the converted pre-video signal…

The radio transceiver element and radio transceiver module are separate components because they wirelessly communicate with each other. The radio transceiver module and transceiver/amplifier section are separate components because they are "electrically coupled." *See Big Stik Mfg., Inc. v. Pitbull Tools & Supplies LLC*, No. 8:17-CV-2486-T-36MAP, 2018 WL 6829726, at *7 (M.D. Fla. Dec. 28, 2018), *reconsideration denied*, No. 8:17-CV-2486-T-36SPF, 2019 WL 2343140 (M.D. Fla. June 3, 2019) (construing "coupled to" as requiring two "separate and distinct" components).

Figure 8 of the '742 patent similarly shows three separate transceivers—"radio transceiver element 91" (first transceiver) is in camera module 10', while "radio transceiver module 85" (second transceiver) and "transceiver/amplifier section 70" (third transceiver) are separate components in PDA 22:



These separate transceivers serve the exact functions described in the claims. Transceiver radio element 91 (first transceiver) wirelessly transmits video signals to transceiver radio module 85 (second transceiver). *Id*. 13:1-11.   Transceiver/amplifier section 70 (third transceiver) is electrically coupled to transceiver radio module 85 and receives and transmits the processed signals.  *Id*. 11:28-35.  Transceiver/amplifier section 70, moreover, is described as a distinct "transceiver."   *Id*. 11:59-61 ("FIG. 4 shows the transceiver/amplifier section 70 as being a cellular digital packet data system (CDPD) type ***transceiver***.").

As required by the intrinsic record, Samsung properly requires the transceiver/amplifier section to be a separate "component."  *See Phillips*, 415 F.3d at 1314-15  (claims "must be read in view of the specification" and "the context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms").  Cellect, in contrast, construes transceiver/amplifier section as "circuitry," because this allows Cellect to argue that the claims cover a product with only two transceivers or with a transceiver/amplifier section that is part of the other transceivers.  This interpretation is inconsistent with both the claim language and the specification, and should be rejected.

### F.    "Time Select Switch"

| Samsung | Cellect |
|---|---|
| "switch for selectively varying integration periods…" | "feature for selectively varying integration periods…" |

The parties dispute only whether "switch" is a well-understood term that needs no construction (Samsung) or whether it should be construed using the broader and less precise term "feature" (Cellect).  Because switch" has a clear meaning that will be well-understood by the jury, it does not require construction.

The Patents' claims and specifications use "switch" consistent with its everyday meaning and as a layperson would understand it.[9]  *See* '740 patent, Fig. 10, 16:45-57

---

[9] "A device for making, breaking, changing the connections in an electrical circuit."  Ex. L, "Switch" Merriam Webster's Collegiate Dictionary 1193 (10th ed. 1997); Ex. M, "Switch" The American Heritage College Dictionary 1373 (3d ed. 1997) ("A device used to break or open an electric circuit or divert current from one conduct to another.").

("An imager integration time select switch 320 is provided enabling an operator to manually select the desired integration period...."); Neikirk ¶¶ 74-80.



Knowing that Samsung's products do not include the claimed switch, Cellect defines "switch" as some amorphous "feature." This, however, broadens the claim to cover *any structure* (regardless of whether it is a switch), finds no support in the Patents, and would confuse the jury. *Nystrom*, 424 F.3d at 1145-46 ("Broadening of the ordinary meaning of a term in the absence of support in the intrinsic record" is improper.").

### G.     Means-Plus-Function Terms

Claims in means-plus-function format are expressed as a "means for" performing a specified function without reciting specific structure in the claim.  35 U.S.C. § 112(6). These terms cover the corresponding structure described in the specification for performing the claimed function.  For such terms, the Court must first identify the claimed function and then identify structures in the specification corresponding to this function.

*Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1351-52 (Fed. Cir. 2015).  The function is typically the language "explicitly recited in the claim."  *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999).  To be "corresponding," structure must be ***clearly linked*** in the specification to the claimed function.  *B. Braun Med., Inc. v. Abbott Labs.*, 124 F. 3d 1419, 1424 (Fed. Cir. 1997).

It is improper to "import functional limitations that are not recited in the claim, or structural limitations from the written description that are unnecessary to perform the claimed function."  *Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001).  Simply put, "Section 112 paragraph 6 does not permit incorporation of structure from the written description beyond that necessary to perform the claimed function."  *Asyst Techs., Inc. v. Empak, Inc.*, 268 F.3d 1364, 1369-70 (Fed. Cir. 2001) (internal quotations omitted).

### 1. "Circuitry Means For Converting"

As shown in Exhibit I, the parties dispute only the function.  As signaled by the preposition "for," Samsung properly identified the function as the claim language appearing after the word "for."  *Micro Chem.*, 194 F.3d at 1258 (the statute does not permit "adopting a function different from that explicitly recited in the claim"; "the properly identified function of this means-plus-function element [is] signaled by the preposition 'for'").  Rather than mirror the claim, Cellect improperly rewrites the claim language by altering "converting" to mean "conditioning… to place it in a form" and "direct reception" to mean "may be viewed."  Cellect's attempt to re-write the claim language should be rejected.  *See Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1208-09 (Fed.

Cir. 2002) (citation omitted) ("To the extent that the district court failed to follow the claim language in defining the function, it erred.").

### 2.   "Timing and Control Means"

As shown in Exhibit I, the parties dispute the function and structure.

Samsung, again, properly identifies the function as the language after "for" and Cellect, again, improperly rewrites the function (changing "information" to "image signal") and also omits part of the claimed function (*i.e.*, producing a pre-video signal). Samsung's function stays true to the claim and should be adopted.

Samsung also properly identifies only the structures in the specification "necessary to perform" and "clearly linked" to the identified functions. *Micro Chem.*, 194 F.3d at 1258 (corresponding structure is only that "necessary to perform the claimed function"); *B. Braun Med.,* 124 F.3d at 1424 (corresponding structure is only that clearly linked or associated with the claimed function). This structure—"Timing and Control Circuits 92"— is the only structure that the specification clearly links with "control[ling] the release of the image information" from or any "timing and control" of the array of pixels. *See* Fig. 4b, 10:33-35 ("The **timing and control circuits 92** are used to **control the release of the image information** or image signal stored in the pixel array."); *see also* 4:4-7.



Fig. 4a

Cellect improperly identifies nearly everything in Figure 4a. While other Figure 4a components are connected to the "Timing and Control Circuits," these are not necessary to perform the claimed function—only the "Timing and Control Circuits" control release of information from the pixel array. 4:4-7, 10:33-35; *see Asyst Techs.,* 268 F.3d at 1369-70; *Wenger Mfg.*, 239 F.3d at 1233.

## V.   CONCLUSION

For the foregoing reasons, Samsung respectfully requests that the Court adopt its constructions.

June 5, 2020

Counsel for Samsung

*/s/ Evan Rothstein*
Evan Rothstein
ARNOLD & PORTER KAYE SCHOLER
370 Seventeenth Street, Suite 4400
Denver, CO  80202-1370
Telephone:  (303) 863-2308
Facsimile:  (312).583-2360
Evan.Rothstein@arnoldporter.com

James R. Batchelder
David S. Chun
ROPES & GRAY LLP
1900 University Ave, 6th Floor
East Palo Alto, CA 94303-2284
Telephone: (650) 617-4000
Facsimile: (650) 617-4090
James.Batchelder@ropesgray.com
David.Chun@ropesgray.com

Steve Pepe
Kevin J. Post
Alexander Middleton
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
Steven.Pepe@ropesgray.com
Kevin.Post@ropesgray.com
Alexander.Middleton@ropesgray.com

Scott. S. Taylor
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
Telephone: (617) 951-7000
Facsimile: (617) 951-7050
Scott.Taylor@ropesgray.com

**COUNSEL FOR DEFENDANTS
SAMSUNG ELECTRONICS CO. LTD.
AND SAMSUNG ELECTRONICS
AMERICA, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on June 5, 2020, electronically filed the foregoing

**DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF** with the Clerk of Court

using the CM/ECF system, which will send notification of such filing to the following e-

mail addresses:

Jonathan S. Caplan – jcaplan@kramerlevin.com
Marcus A. Colucci – mcolucci@kramerlevin.com
Paul J. Andre – pandre@kramerlevin.com
Kenneth F. Eichner– Ken@EichnerLaw.com
Lynn C. Hartfield – lynn@eichnerlaw.com

***Attorneys for Plaintiff***

By:   */s/ Evan Rothstein*
      Evan Rothstein


## CERTIFICATE OF COMPLIANCE

Pursuant to D.C.COLO.LPtR 17, the undersigned certifies that this Brief complies

with the word limitation. According to the word-processing system's word count, the

Brief contains 6105 words, excluding the cover page, the tables, signature blocks, and

the certificates. Samsung's annotations to the figures include any additional 60 words

for a total of 6165 words.

By:   */s/ Evan Rothstein*
      Evan Rothstein